| |
|---|
| **UNITED STATES BANKRUPTCY COURT** <br> **DISTRICT OF NEW JERSEY** <br> *Caption in Compliance with D.N.J. LBR 9004-1(b)* <br> **SAUL EWING LLP** <br> Stephen B. Ravin, Esquire <br> Turner N. Falk, Esquire <br> One Riverfront Plaza <br> 1037 Raymond Blvd., Suite 1520 <br> Newark, NJ 07102-5426 <br> Telephone: (973) 286-6714 <br> E-mail:  stephen.ravin@saul.com <br>              turner.falk@saul.com <br> <br> *Counsel to the Debtors and Debtors in Possession* |

| | |
|---|---|
| In re: <br><br> NEW JERSEY ORTHOPAEDIC INSTITUTE LLC, *et al.*, <br><br>                    Debtors.[1] | Chapter 11 <br><br> Case No. 25-11370 (JKS) <br><br> (Jointly Administered) |

# DEBTORS' COMBINED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION

Debtors/Plan Proponents New Jersey Orthopaedic Institute LLC and Northlands Orthopaedic Institute LLC respectfully submit this Combined Disclosure Statement and Plan of Reorganization pursuant to Chapter 11, Title 11 of the United States Code.

**PLEASE READ THIS DOCUMENT CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THIS PLAN OF REORGANIZATION. THE PLAN PROPONENT BELIEVES THAT THIS PLAN OF REORGANIZATION IS IN THE BEST INTEREST OF THE CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE. THE PROPONENT URGES THAT THE VOTER ACCEPT THE PLAN.**

|  |  |
|---|---|
|  | New Jersey Orthopaedic Institute LLC and Northlands Orthopaedic Institute LLC |
|  | /s/ Vincent K. McInerney |
| Dated: June 4, 2025 | By: Dr. Vincent K. McInerney, Principal of the Debtors |

---

[1]    The last four digits of Debtor New Jersey Orthopaedic Institute LLC's tax identification number are 3560; the last four digits of Debtor Northlands Orthopaedic Institute LLC's tax identification number are 9828. The location of both Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 504 Valley Road, Suite 200, Wayne NJ 07470.

4860-3756-3138

**TABLE OF CONTENTS.**

I. INTRODUCTION ................................................................................................................. 1

    A. Purpose of This Document ............................................................................................ 1

    B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing .................... 1

        1. Time and place of the hearing to approve this Disclosure Statement; ...................... 2

        2. Deadline for voting to accept or reject the Plan; and ................................................ 2

        3. Deadline for objecting to the adequacy of this Disclosure Statement. ..................... 2

    C. Disclaimer ...................................................................................................................... 2

II. BACKGROUND .................................................................................................................. 2

    A. Description and History of the Debtor's Business ......................................................... 2

    B. Insiders of the Debtor ..................................................................................................... 2

    C. Management of the Debtor During the Bankruptcy ....................................................... 3

    D. Events Leading to Chapter 11 Filing ............................................................................. 3

    E. Significant Events During the Bankruptcy Case ........................................................... 4

    F. Projected Recovery of Avoidable Transfers .................................................................. 5

    G. Claims Objections .......................................................................................................... 5

    H. Current and Historical Financial Conditions ................................................................. 6

III. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT
OF CLAIMS AND EQUITY INTERESTS ......................................................................... 6

    A. What Is the Purpose of the Plan of Reorganization? ..................................................... 6

    B. Unclassified Claims ....................................................................................................... 6

        1. Administrative expenses, quarterly and Court fees ................................................... 6

        2. Priority tax claims ...................................................................................................... 7

    C. Classes of Claims and Equity Interests .......................................................................... 7

        1. Classes of secured claims ........................................................................................... 7

        2. Classes of priority unsecured claims ......................................................................... 8

        3. Classes of general unsecured claims ......................................................................... 8

        4. Classes of equity interest holders .............................................................................. 9

    D. Means of Implementing the Plan ................................................................................... 9

        1. Source of payments .................................................................................................... 9

        2. Post-confirmation Management ............................................................................... 10

    E. Risk Factors ................................................................................................................. 10

    F.    Executory Contracts and Unexpired Leases ................................................................. 10

    G.    Tax Consequences of Plan .......................................................................................... 11

**IV. CONFIRMATION REQUIREMENTS AND PROCEDURES** ...................................... 12

    A.    Who May Vote or Object ............................................................................................ 12

        1.    What is an allowed claim or an allowed equity interest? ........................................ 12

        2.    What is an impaired claim or impaired equity interest? ......................................... 13

        3.    Who is not entitled to vote ...................................................................................... 13

        4.    Who can vote in more than one class ..................................................................... 13

    B.    Votes Necessary to Confirm the Plan ........................................................................ 13

        1.    Votes necessary for a class to accept the plan ....................................................... 13

        2.    Treatment of non-accepting classes of secured claims, general unsecured claims, and interests ........................................................................................................... 14

    C.    Liquidation Analysis .................................................................................................. 14

    D.    Feasibility ................................................................................................................... 14

        1.    Ability to initially fund plan ................................................................................... 15

        2.    Ability to make future plan payments and operate without further reorganization . 15

**V. EFFECT OF CONFIRMATION OF PLAN** ..................................................................... 15

    A.    Discharge of Debtor, Releases by Debtor and Enforcing Injunction ............................ 15

    B.    Modification of Plan .................................................................................................. 16

    C.    Waiver of Stay of Confirmation Order and Immediate Effect .................................... 16

## I. INTRODUCTION

New Jersey Orthopaedic Institute LLC and Northlands Orthopaedic Institute LLC (the "<u>Debtors</u>") are the debtors in these jointly-administered chapter 11 bankruptcy cases. On February 10, 2025 (the "<u>Petition Date</u>"), the Debtors commenced their bankruptcy cases by filing chapter 11 petitions under the United States Bankruptcy Code ("<u>Bankruptcy Code</u>"), 11 U.S.C. § 101 *et seq*.

This document is the combined Disclosure Statement (the "<u>Disclosure Statement</u>") and Chapter 11 plan ("<u>Plan</u>") proposed by the Debtors ("<u>Proponents</u>"). This Disclosure Statement provides information about the Debtors and the Plan to help you decide how to vote. **Your rights may be affected**. **You should read the combined Disclosure Statement and Plan carefully. You may wish to consult an attorney about your rights and your treatment under the Plan.**

This is a reorganization plan. In other words, the Proponents seek to accomplish payments under the Plan by making distributions from present assets and future cash flows. The Effective Date of the proposed Plan is the date on which an order confirming the Plan is entered.

General unsecured creditors are classified in Class 2, and as described in greater detail herein, are eligible to receive a pro rata percentage of their allowed claims, to be distributed pursuant to this Plan.

### A. Purpose of This Document

This Disclosure Statement and Plan describes: (a) the Debtors and significant events during the bankruptcy case; (b) how the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you will receive on your claim or equity interest if the plan is confirmed); (c) who can vote on or object to the Plan; (d) what factors the Bankruptcy Court will consider when deciding whether to confirm the Plan; (e) why the Debtor believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and (f) the effect of confirmation of the Plan.

### B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described herein. A separate order will be entered setting the following information:

4860-3756-3138

1. Time and place of the hearing to approve the Disclosure Statement;

2. Deadline for voting to accept or reject the Plan; and

3. Deadline for objecting to the adequacy of this Disclosure Statement.

If you want additional information about the Plan or the voting procedure, you should contact: Stephen B. Ravin, Esquire, Saul Ewing LLP, One Riverfront Plaza, 1037 Raymond Blvd., Suite 1520, Newark, NJ 07102-5426, Telephone: (973) 286-6714, E-mail: stephen.ravin@saul.com.

### C. Disclaimer

The Court will consider whether this Disclosure Statement may be approved as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.

## II. BACKGROUND

### A. Description and History of the Debtors' Business

Debtor New Jersey Orthopaedic Institute LLC, formerly McInerney Orthopaedic and Sports Medicine, LLC, was established in 2009.

Northlands Orthopaedic Institute LLC was created in October 2019, strictly for the separation of claims processed in and out of network. All out-of-network claims are submitted through Northlands Orthopaedic Institute; all in-network claims with insurance carriers are submitted through New Jersey Orthopaedic Institute.

Together, these Debtors form an orthopedic and sports medicine practice that provides medical and surgical services to patients. The practice also offers services to numerous local schools, as well as medical coverage during high school football games. Currently, the practice has four doctors and one mid-level provider.

### B. The Debtors' Ownership and Corporate Structure

All of the Debtors are direct or indirect subsidiaries of non-debtor Dr. Vincent K. McInerney, MD. Northlands Orthopaedic Institute LLC owns 99% of New Jersey Orthopaedic Institute LLC. Dr. McInerney owns 1% of New Jersey Orthopaedic Institute LLC and 100% of Northlands Orthopaedic Institute LLC.

### C. The Debtors' Debt Obligations

The Debtors do not have any outstanding commercial loans or other business debts, aside from ordinary trade payables, and the amounts owed to the Judgment Creditors (defined below).

### D. Events Leading to Chapter 11 Filing

The Debtors previously included as members a number of other doctors. Following a dispute with these other members, a number of doctors left the Debtors.

The current members of the Debtors and these departing doctors and associated parties – Anthony Festa, M.D., Anthony Scillia, M.D., Craig Wright, M.D., John Callaghan, M.D., Casey Pierce, M.D., and Academy Orthopaedics LLC (collectively, the "Judgment Plaintiffs") engaged in a contested "business divorce" over the terms of their departure and the financial obligations created thereby.

The parties to the dispute engaged in binding arbitration. In May, 2022, the Debtors transferred the sum of $1.75 million to the attorney trust account of Frier Levitt LLC (the "FL Escrow"), during the pendency of the litigation between the Debtors, Dr. McInerney and the Judgment Creditors, which was referred to arbitration before Ira Marcus, Esq. (the "Arbitrator") of the American Health Law Association (the "Arbitration").

On February 19, 2024, the Arbitrator entered an award, which found substantially in favor of the Judgment Creditors and against the Debtors.

On September 23, 2024, the Superior Court of New Jersey Passaic County Chancery Division, General Equity entered an order in *Anthony Festa, M.D., Anthony Scillia, M.D., Craig Wright, M.D., John Callaghan, M.D., Casey Pierce, M.D., and Academy Orthopaedics LLC v. Vincent McInerney, M.D., New Jersey Orthopaedic Institute LLC, and Northlands Orthopaedic Institute LLC*, case no. PAS-C-26-24 entering the arbitration award in favor of the Judgment Creditors as a judgment in the amount of $7,605,000.00 (the "Judgment").

On January 30, 2025, a writ of execution in connection with the Judgment was issued.

After the writ was issued, it was delivered to the Morris County Sheriff, who levied on the Debtors' bank accounts and the FL Escrow in the total amount of $7,771,214.04 on February 4, 2025 (the "Levy").

The Levy further restrained the $1.75 million transferred by the Debtors to the FL Escrow in 2022, with interest accrued thereon, and imposed a lien upon the following account balances in the total amount of $684,073.29:

A. Wells Fargo Account #5229 in the amount of $2,572.98;
B. Wells Fargo Account #5179 in the amount of $13,999.30;
C. Wells Fargo Account #2324 in the amount of $641,228.15.
D. Valley National Bank Account #9931 in the amount of $26,262.86; and
E. Valley National Bank Account #7645 in the amount of $10.00

3

       The Levy froze the funds in the Debtors' operating bank accounts, and the Debtors did not have sufficient funds to make their next payroll or pay other necessary ordinary course expenses.

### E.    Significant Events During the Bankruptcy Case

       On February 10, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Court").

       On the Petition Date, by way of a verified complaint and application for an order to show cause, the Debtors commenced Adv. Pro. No. 25-01036 (JKS), seeking to set aside the Levy as a preferential transfer under 11 U.S.C. §§ 547 and 550 and a violation of the automatic stay under 11 U.S.C. § 362 (the "Adversary Proceeding"). [Adv. Pro. D.I. 1].

       The Judgment Creditors opposed the Debtors' order to show cause, and contend that the $1.75 million in the FL Escrow was not property of the Debtors' estates or, in the alternative, that the Judgment Creditors held a perfected security interest in the FL Escrow.

       Pursuant to a series of orders agreed to between the Debtors and Judgment Creditors, Saul Ewing LLP came to hold funds subject to the Levy in the present amount of approximately $580,000.00 in escrow (the "Saul Escrow"), pending resolution of the Adversary Proceeding.

       The Judgment Creditors filed an *Answer and Third-Party Complaint* in the Adversary Proceeding, asserting, among other claims and defenses, that the FL Escrow was not property of the Debtors' bankruptcy estates that the Judgment Creditors held an additional non-dischargeable claim against the Debtors and naming Dr. McInerney as a party and bringing third party claims against him.

### F.    The Settlement Agreement

       On April 23, 2025, the Debtors and the Judgment Creditors engaged in a Court-facilitated mediation. During that mediation, the Debtors and the Judgment Creditors reached a settlement of all issues in the Adversary Proceeding and bankruptcy cases (the "Settlement Agreement"). To avoid the incurrence of continuing and substantial expenses and the significant uncertainties of litigation, these parties decided to compromise, settle, forever resolve, and finally dispose of all outstanding disputes between them and obtain the Judgment Creditors' support for the confirmation of this Plan of reorganization.

       A motion to approve the Settlement Agreement will be scheduled for a hearing alongside or before the hearing on confirmation of this Plan. A summary of the key terms of the Settlement Agreement, all of which are subject to Court approval, is set forth below, but in the event of any conflict, the Settlement Agreement controls:

       The Judgement Creditors have allowed secured claims in the amount of $2,434,565.41 secured by the FL Escrow and Saul Escrow, and general unsecured claims of $5,373,822.31.

The Judgment Creditors will accept and support any Plan consistent with the Settlement Agreement.

On the Effective Date of the Plan, the Adversary Proceeding will be dismissed with prejudice and the Debtors, McInerneys and Judgment Creditors will mutually release each other from all claims except those imposed by the Plan and/or Settlement Agreement.

On the Effective Date of this Plan, the Debtors will transfer to the Judgment Creditors the FL Escrow and $300,000 from the Saul Escrow on account of their secured claims.

The Debtors will pay the Judgment Creditors $300,000 over 30 months on account of their unsecured claims, which shall be memorialized by a promissory note.

Dr. McInerney and his wife Lisa McInerney (the "McInerneys") will make the following transfers (the "New Value Contribution"):

- The McInerneys will cause the funding shortfall in the cash balance plan administered by Merrill Lynch (the "Cash Balance Plan") to be paid, shall direct the Cash Balance Plan to disburse to the Judgment Creditors their portion of the Cash Balance Plan to accounts of the Judgment Creditors' choosing and shall transfer cash or assets worth $300,000.00 from Dr. McInerney's portion of the Cash Balance Plan to the Judgment Creditors, as the Judgment Creditors direct.

- The McInerneys will transfer their membership interests in the entities that own the real estate located at 504 Valley Rd, Suite 22, Wayne, NJ 07470 and the real estate located at 622 Eagle Rock Avenue, West Orange, NJ 07052.

- Dr. McInerney will personally guarantee the Debtors' obligations under the aforementioned promissory note.

### G.    Projected Recovery of Avoidable Transfers

The Debtors are settling all potential avoidance actions against their Insiders in consideration for the New Value Contribution.  The remaining potential avoidance actions are both uneconomical, given the ordinary course defenses available to the potential defendants, and pursuit of those claims would harm relations with the potential defendants, who are key vendors and ordinary course creditors.  As a result, the Debtors do not intend to pursue any avoidance actions.

### H.    Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtors reserve the right to object to claims and shall file objections on or before sixty (60) days from the Effective Date of the Plan.

### I.  Current and Historical Financial Conditions

The identity and value of the estate's assets are listed on the Debtors' Schedule A/B filed in these chapter 11 cases.

The current financial conditions of the Debtors are set forth in the most recent post-petition operating report filed in these chapter 11 cases.

### III.  SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

#### A.  What Is the Purpose of the Plan of Reorganization?

As required by the Bankruptcy Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

#### B.  Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. Therefore, the Proponent has not placed the following claims in any class:

1. Administrative expenses, quarterly and Court fees

Administrative expenses are costs or expenses of administering the Debtors' chapter 11 case which are allowed under Section 503(b) of the Bankruptcy Code. Administrative expenses include the value of any goods sold to the Debtors in the ordinary course of business and received within 20 days before the date of the bankruptcy petition, and compensation for services and reimbursement of expenses awarded by the court under Section 330(a) of the Bankruptcy Code. The Bankruptcy Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment. The Bankruptcy Code also requires that fees owed under 28 U.S.C. §1930, including quarterly and court fees, have been paid or will be paid on the Effective Date.

The following chart lists the Debtors' estimated administrative expenses, and quarterly and court fees, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses arising in the ordinary course of business after the Petition Date. | None. | Any ordinary course administrative expenses not paid in the ordinary course shall be paid in full on the Effective Date or when due, whichever is later. |

6

| | | |
|---|---|---|
| Professional Fees, as approved by the Court. | Fees and expenses of the Debtors' professionals as of June 2025 are approximately as follows:<br>Bankruptcy Counsel (Saul Ewing LLP): $200,000<br>Special Counsel (Frier Levitt): $50,000<br>Accountant (Elementary Business Inc.): $50,000 | Paid in full upon approval by the Court. |
| Clerk's Office Fees | None | Paid in full on the Effective Date. |
| Office of the U.S. Trustee Fees | $0.00 | Paid quarterly with any outstanding balance paid in full on the Effective Date. |
| Total: | Approximately $300,000.00 | |

2. Priority tax claims

Priority tax claims are unsecured income, employment, and other taxes described by Section 507(a)(8). Unless the holder of such a Section 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim pursuant to 11 U.S.C. § 511, in regular installments paid over a period not exceeding 5 years from the order of relief.

The IRS and New Jersey Department of Taxation filed alleged priority tax claims. The Debtors are pass-through tax entities and do not pay these taxes at the entity level. The Debtors will work to resolve these claims via negotiations or an objection. There are no other Section 507(a)(8) priority tax claims.

### C.  Classes of Claims and Equity Interests

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

1. Classes of secured claims

Allowed Secured Claims are claims secured by property of the Debtors' bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under Section 506. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

The following charts list all of the Debtors' consensual secured prepetition claims and their proposed treatment under the Plan:

7

| Class | Description | Impairment | Treatment |
|---|---|---|---|
| Class # 1 | Judgment Creditors | Yes | Class 1 is the Secured Claim of the Judgment Creditors, secured by the bank and escrow accounts subject to the Levy. The treatment to be provided to Class 1 is in full and final satisfaction of these Secured Claims.<br><br>Pursuant to the Settlement Agreement, this Class retains its liens until payment of the amounts set forth in the Settlement Agreement, but upon payment of $300,000 from the Saul Escrow, the Judgment Creditors are deemed to release their lien on any remaining funds in the Saul Escrow. |

2. Classes of priority unsecured claims

The Code requires that, with respect to a class of claims of a kind referred to in 11 U.S.C. §§ 507(a)(1), (4), (5), (6), and (7), each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim, unless a particular claimant agrees to a different treatment or the class agrees to deferred cash payments.

McKesson Medical-Surgical filed a claim in the amount of $19,409.18 claiming priority under Section 507(a)(2). The Debtors will pay this claim in full on the Effective Date from held funds or operating revenues. There are no other claims under §§ 507(a)(1), (4), (5), (6), and (7) of the Code.

3. Classes of general unsecured claims

General unsecured claims are not secured by property of the estate and are not entitled to priority under Section 507(a).

The following chart identifies the Plan's proposed treatment of the subclasses within class 2, which contain general unsecured claims against each of the Debtors. The Judgment Creditors are the primary creditors of both Debtors, and will be paid a total of $300,000 on account of their unsecured claims, representing a 5.58% distribution on account of their joint and several claims against both Debtors. All other general unsecured creditors will be paid a 3% pro rata share on account of their claims against each Debtor, as follows:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| Class #2(a) | General Unsecured Creditors of New Jersey Orthopaedic Institute LLC; aggregate amount of claims is approximately $6.7 million, including unsecured portions of the claims of the Judgment Creditors | Yes | The Judgment Creditors will receive $300,000 over 30 months on account of their claims against both Debtors, representing an effective 2.79% distribution on account of their Class |

8

| | | | |
|---|---|---|---|
| | | | 2(a) claims. All other Class 2(a) creditors will receive a pro rata 3% distribution over 30 months. |
| Class #2(b) | General Unsecured Creditors of Northlands Orthopaedic Institute LLC; aggregate amount of claims is approximately $5.5 million, including unsecured portions of the claims of the Judgment Creditors | Yes | The Judgment Creditors will receive $300,000 over 30 months on account of their claims against both Debtors, representing an effective 2.79% distribution on account of their Class 2(b) claims. All other Class 2(b) creditors will receive a pro rata 3% distribution over 30 months. |

4. Classes of equity interest holders

Equity interest holders are parties who hold an ownership interest (i.e., equity interest) in the Debtors. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a limited liability company (LLC), the equity interest holders are the members. Finally, with respect to an individual who is a debtor, the Debtor is the equity interest holder.

The following chart sets forth the Plan's proposed treatment of equity interest holders:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| Class #3 | Equity Interest Holders are as follows:<br><br>Northlands Orthopaedic Institute LLC:<br>Vincent K. McInerney: 100%<br><br>New Jersey Orthopaedic Institute LLC:<br>Vincent K. McInerney: 1%<br>Northlands Orthopaedic Institute LLC: 99% | No | Class 3 is unimpaired by this Plan. All equity holders retain their equity post-confirmation on account of the New Value Contribution. |

**D.    Means of Implementing the Plan**

1. Source of payments

Payments and distributions under the Plan will be funded by the following:

9

      i.      **Held Funds**: Distributions from the FL Escrow and Saul Escrow will be made to the Judgment Creditors pursuant to the Settlement Agreement.  Any remaining funds in the Saul Escrow will be used to pay administrative claims as they are allowed.  Any further funds will be applied to the Debtors' ordinary course expenses or towards other payments under the Plan, as the Debtors determine in their business judgment.

      ii.      **Operations**: Net cash from operations will fund incremental monthly payments under the Plan.

      iii.      **New Value Contribution:**  Pursuant to the Settlement Agreement, the McInerneys have made or will make the New Value Contribution from their shares of the Cash Balance Plan, their ownership in real estate holding entities and from their other sources of funds.  These are contributions of money or money's worth exceeding $300,000, are reasonably equivalent to the unimpaired equity interests retained pursuant to this Plan and are necessary to the performance of this Plan.

      iv.      **Potential Affiliation Agreement:**  The Debtors are pursuing an opportunity to affiliate their practice with other larger healthcare providers.  A successful affiliation agreement will permit the practice to bill more patients as in-network, and to charge higher negotiated in-network rates, both of which will increase the collectability and profitability of operations.

Kinga Skalska-Dybas, the Debtors' CFO, shall serve as Disbursing Agent for the Debtors, and shall make monthly disbursements of funds from the above sources to the Classes entitled to receive them pursuant to this Plan.  The Disbursing Agent shall not be paid for her efforts as Disbursing Agent and no bond is required.

      2.   Post-confirmation Management

The Post-Confirmation Management of the Debtors will remain with current management, mainly Dr. McInerney, the current principal.

      **E.**      **Risk Factors**

The proposed Plan has the following risks:
Risks inherent in the business of operating an orthopaedic practice, including client generation issues, difficulties in collecting in-network or out-of-network claims and other ordinary business risks.

      **F.**      **Executory Contracts and Unexpired Leases**

The Debtors will file a list of all executory contracts and leases they intend to reject, if any, prior to the confirmation hearing.  All executory contracts and leases on such filed list are deemed rejected on the Effective Date.  All executory contracts and unexpired leases that are not listed in the filed list or have not previously been assumed, and if applicable assigned, or are not the subject of a pending motion to assume, and if applicable assign, will be deemed assumed on the Effective Date.

      Any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied, under Section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

      The amount necessary to cure any default under an executory contract or unexpired lease (the "<u>Cure Amount</u>") is the amount, if any, set forth in the Debtors' Schedules as owing to the non-Debtor counterparty to such executory contract or unexpired lease, unless a timely proof of claim is filed by the non-Debtor counterparty, in which case the proof of claim amount constitutes the Cure Amount, subject to the Debtors' right to object to such proof of claim. In the event of a dispute regarding (1) the Cure Amount as set forth on a proof of claim, (2) the ability of the reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assumed, or (3) any other matter pertaining to assumption, the Bankruptcy Court will hear such dispute prior to the assumption becoming effective. The payment of a disputed Cure Amount shall be made following the entry of a final order or orders resolving such dispute and approving the assumption, and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

      Assumption of any executory contract or unexpired lease under the Plan or otherwise and payment of the applicable Cure Amount shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption. Any proof of claim filed with respect to an executory contract or unexpired lease that is assumed and for which the applicable Cure Amount is paid shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

      If you object to the assumption of your unexpired lease or executory contract under the Plan, the proposed cure of any defaults, the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

      The deadline for filing a proof of claim based on a claim arising from the rejection of a lease or contract is thirty (30) days after entry of an order authorizing the rejection of the lease or contract. Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

      **G.**    **Tax Consequences of Plan**

      **Creditors and equity interest holders concerned with how the plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors.**

The Debtors are not aware of any tax consequences as a result of confirmation of the Plan. Nevertheless, there may be tax consequences to the Debtors and creditors as a result of any discharge, or in connection with the receipt of Plan consideration after confirmation.

IV.    **CONFIRMATION REQUIREMENTS AND PROCEDURES**

To be confirmable, the Plan must meet the requirements listed in Section 1129. These include the requirements that: (1) the Plan must be proposed in good faith; (2) if a class of claims is impaired under the Plan, at least one impaired class of claims must accept the Plan, without counting votes of insiders; (3) the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and (4) the Plan must be feasible. These requirements are not the only requirements listed in Section 1129, and they are not the only requirements for confirmation.

A.    **Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. Except as stated in Part IV.A.3 below, a creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that <u>Classes 1 and 2 are impaired.</u> Holders of allowed claims in those classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that <u>Class 3 is unimpaired</u>, is thus deemed to accept the Plan and is not entitled to vote.

1. What is an allowed claim or an allowed equity interest?

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either: (1) the Debtors have scheduled the claim on their schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest.

When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

***The deadline for filing a proof of claim in this case was April 21, 2025.***

2. What is an impaired claim or impaired equity interest?

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is impaired under the Plan. As provided in Section 1124, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

3. Who is not entitled to vote

The holders of the following five types of claims and equity interests are not entitled to vote:

i. holders of claims and equity interests that have been disallowed by an order of the Court;
ii. holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes;
iii. holders of claims or equity interests in unimpaired classes;
iv. holders of claims entitled to priority pursuant to Sections 507(a)(2), (a)(3), and (a)(8);
v. holders of claims or equity interests in classes that do not receive or retain any value under the Plan; and
vi. administrative expenses.

**Even if you are not entitled to vote on the plan, you have a right to object to the confirmation of the Plan and to the adequacy of the Disclosure Statement.**

4. Who can vote in more than one class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

**B.    Votes Necessary to Confirm the Plan**

The Court cannot confirm the Plan unless: (1) all impaired classes have voted to accept the Plan; or (2) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and the Plan is eligible to be confirmed by "cram down" of the non-accepting classes, as discussed later in Section B.2.

1. Votes necessary for a class to accept the plan

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than 1/2 of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least 2/3 in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

13

      2. Treatment of non-accepting classes of secured claims, general unsecured claims, and interests

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan upon the request of the Plan proponent if the non-accepting classes are treated in the manner prescribed by Section 1129(b). A plan that binds non-accepting classes is commonly referred to as a "cram down" plan. The Bankruptcy Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of Section 1129(a)(8), does not discriminate unfairly, and is fair and equitable toward each impaired class that has not voted to accept the Plan.

**You should consult your own attorney if a cram down confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.**

### C. Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation on the Effective Date.

The Plan treats all creditors at least as well as they would be treated in a chapter 7 liquidation on the effective date, as shown by the liquidation analysis attached as **Exhibit A**. This liquidation analysis shows that even if receivables aged less than 90 days were collected at face value, the Debtors' liabilities exceed their assets by approximately $8 million.

In a liquidation, the administrative claims of Debtors' professionals would be paid in full first, for over $300,000.00. The Secured Claims of the Judgment Creditors would consume most other available cash assets.

The remaining assets in a liquidation are accounts receivable. The chapter 7 trustee performing this liquidation would be paid its own fees as an administrative claim. This would likely consume most or all of the collectable accounts receivable, leaving nothing for the unsecured creditors.

By preserving the Debtors as a going concern, the Plan provides that the unsecured creditors will receive their pro rata share from cash flow from ongoing operations and other funding sources, instead of receiving nothing in a liquidation.

### D. Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan.

1. Ability to initially fund plan

The Proponent believes that the Debtors will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date. The only administrative claims are that of Debtors' professionals. The Debtors submit that the funds in the Saul Escrow remaining after the payment to the Judgment Creditors will be sufficient to pay professional expenses in full as they are allowed by the Court.

2. Ability to make future plan payments and operate without further reorganization

The Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the debtor's business.

The Debtors have sufficient funds on hand, or available pursuant to the New Value Contribution, to make the initial transfers pursuant to the Settlement Agreement and to pay all administrative expenses on the Effective Date or when later approved by the Court.

As demonstrated by the 13-week cash flow projections attached as Exhibit B, the Debtors will generate sufficient profits from operations to make the remaining incremental payments to general unsecured claims in Class 2(a), (b) over the proposed 30-month timeline.

V. **EFFECT OF CONFIRMATION OF PLAN**

A. **Discharge of Debtors, Releases by Debtors and Enforcing Injunction**

This Plan provides that upon confirmation of the Plan, the Debtors are discharged of liability for payment of debts incurred before Confirmation, pursuant 11 U.S.C. §1141. However, any liability imposed by the Plan will <u>not</u> be discharged. If Confirmation of this Plan does not occur, the Plan will be null and void and nothing contained in this Plan will constitute a waiver or release of any claims against the Debtors or their estates or any other persons, or to prejudice in any manner the rights of the Debtors or their estates or any person in any further proceeding involving the Debtors or their estates. The provisions of the Plan are binding upon Debtors, all creditors and all equity interest holders, regardless of whether such claims or equity interests are impaired or whether such parties accept this Plan. The discharge and injunction provided for in this Plan does not discharge any obligation imposed by this Plan or the Settlement Agreement.

In consideration of the New Value Contribution, which is valuable consideration necessary to the consummation and performance of the Plan and the reorganization of the Debtors, on the Effective Date, the Debtors and their estates release the McInerneys and their professionals, agents, assigns, successors, heirs and affiliates, from any and all claims or causes of action that the Debtors or their estates possessed against them prior to the Effective Date.

**The discharge of debts and the releases by the Debtors are enforced by an injunction such that, except as provided in the Plan or the order confirming the Plan, as of the Effective Date, all persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an interest or other right of an equity security**

15

**holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the reorganized Debtors, and their respective subsidiaries or their property on account of any such discharged claims, debts, or liabilities or terminated interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or the reorganized Debtors; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any person that does not comply with or is inconsistent with the provisions of the Plan.**

        B.        **Modification of Plan**

The Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or re-voting on the Plan.

Upon request of the Debtors, the United States trustee, or the holder of an allowed unsecured claim, the Plan may be modified at any time after confirmation of the Plan but before the completion of payments under the Plan, to: (1) increase or reduce the amount of payments under the Plan on claims of a particular class, (2) extend or reduce the time period for such payments, or (3) alter the amount of distribution to a creditor whose claim is provided for by the Plan to the extent necessary to take account of any payment of the claim made other than under the Plan.

        C.        **Waiver of Stay of Confirmation Order and Immediate Effect**

The performance of the Plan depends upon the prompt consummation of the Settlement Agreement, including the New Value Contribution. This constitutes cause to waive the 14-day stay of a confirmation order pursuant to Fed. R. Bankr. P. 3020(e). The waiver of this stay will permit the Debtors and other parties to the Settlement Agreement to complete the transactions necessary to perform the Plan as expeditiously as possible.

|  |  |
|---|---|
|  | New Jersey Orthopaedic Institute LLC and Northlands Orthopaedic Institute LLC |
|  | /s/ Vincent K. McInerney |
| Dated: June 4, 2025 | By: Dr. Vincent K. McInerney, Principal of the Debtors |

SAUL EWING LLP

| | | |
|---|---|---|
| Dated: June 4, 2025 | By: | */s/ Stephen B. Ravin* |
| | | Stephen B. Ravin, Esquire |
| | | Turner N. Falk, Esquire |
| | | One Riverfront Plaza |
| | | 1037 Raymond Blvd., Suite 1520 |
| | | Newark, NJ 07102-5426 |
| | | Telephone: (973) 286-6714 |
| | | E-mail: stephen.ravin@saul.com |
| | | turner.falk@saul.com |

*Counsel to the Debtors and Debtors in Possession*

17