UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**MEYNER AND LANDIS LLP**
William J. Fiore, Esq.
Attorney ID: 016431977
One Gateway Center, Suite 2500
Newark, New Jersey 07102
Ph: (973) 602-3457
Fax: (973) 602-0356
*Attorneys for Creditor*
*Michael Shindle*

_____

—

**In Re:**

**NEW JERSEY ORTHOPAEDIC INSTITUTE LLC, et al.**

Chapter 11

Case No. 25-11370 (JKS)

HEARING DATE AND TIME:

September 30, 2025 at 10:00 a.m.

OBJECTION DEADLINE:

September 23, 2025

**MICHAEL SHINDLE'S CERTIFICATION IN OPPOSITION TO DEBTOR'S MOTION OBJECTING TO CLAIM**

   **MICHAEL SHINDLE**, of due age, hereby certifies as follows:

1.   I am a New Jersey licensed orthopedic surgeon.

2.   I worked in good standing for the Debtor from December 6, 2022 until **March 1, 2025.** To my surprise, our payroll was frozen and we were informed the company filed Chapter 11 bankruptcy on February 14, 2024.  This was extremely chaotic and due to the financial uncertainty of the company I chose to resign and submitted my formal resignation and gave 60 days notice on February 22, 2025(Exhibit A).  In an attempt to avoid the consequences of termination and my proof of claim, Debtor sent me a service termination letter on March 1, 2025 **after** I submitted my resignation.

3.   I am making this Certification in opposition to Debtor's motion to strike my filed proof of claim.

4.   My claim consists of three components:

   (a) Productivity bonus;

(b) Loss of annual salary;

(c) Malpractice costs.

These are directly related to my employment contract ("Employment Contract"), which the Debtor drafted and maintained an original copy. It is ironic for Debtor to claim that my Employment Contract is not attached when they have the copy. (Exhibit B).

5. There is a specific provision relating to my Productivity Bonus (See Employment Contract) in which I was to receive a bonus in addition to base salary based on my productivity. This reflects the Productivity Bonus in my Proof of Claim. My production entitled me to a Productivity Bonus of $208,452.68 based on the Employment Contract. This was confirmed in January 15, 2025 email from Kinga Skalska-Dybas of Debtor (Exhibit C).

6. Debtor claims that I did not perform my work, yet if I did not, I would not have the productive levels to qualify for the bonus. To qualify for the productivity bonus, I have approximately $1.25 million in revenue. I studied for board certification on my own time, not on company time.

7. My loss of compensation salary is one  year ($400,000.00) since I had no employment until recently.

8. My malpractice coverage is included specifically in the Employment Contract contrary to Debtor's assertion. (See Employment Contract).

9. The cost of malpractice coverage was $53,034.00, and I could not obtain employment without this coverage in place. My receipt is attached (Exhibit D). Of course I paid it since Debtor would not.

10. Debtor has made various statements about me with regard to my employment.

11. First, I did not violate any restrictive covenant. I was prohibited from employment within a 5.0 mile radius of Debtor's business address. My current employment is 5.6 miles away.

12. I did not solicit any of Debtor's employees to join me at my current employer.

13. The educational conference was planned in advance of my termination and non-refundabe ticket was obtained. In any event, the costs were allowed under the employment contract.

Based upon my Certification, my Proof of Claim should stand.

MICHAEL SHINDLE

Dated: 9/18/25

# EXHIBIT A

February 22, 2025


Dear Dr. McInerney,

Please accept this letter as my formal resignation from New Jersey Orthopaedic Institute, effective 60 days from today.  I am grateful for the opportunities for growth and development during my time here.  I will do my best to ensure a smooth transition.  Thank you for your understanding and support during this transition.

Sincerely,

Michael Shindle

# EXHIBIT B

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "**Agreement**") is made this day 6th day of December, 2022 (the "**Effective Date**"), by and between:

**NEW JERSEY ORTHOPAEDIC INSTITUTE, LLC,** a New Jersey limited liability company, having offices at 504 Valley Road, Suite 200, Wayne, New Jersey 07470 ("**Practice**")

and

**MICHAEL KENNETH SHINDLE, M.D.,** residing at 35 Meadow Lane, Morristown, New Jersey 07960 ("**Physician**").

### WITNESSETH

**WHEREAS,** Practice is a limited liability company engaged in the practice of medicine and surgery under the laws of the State of New Jersey; and

**WHEREAS,** Physician is licensed to practice medicine under the laws of the State of New Jersey; and

**WHEREAS,** Practice desires to employ Physician, and Physician desires to be employed by Practice under the terms, covenants and conditions as set forth in this Agreement;

**NOW, THEREFORE,** in consideration of the foregoing premises, and the terms, covenants and conditions set forth in this Agreement, and for other good and valuable consideration, the parties, desiring to be legally bound, agree as follows:

1.  **EMPLOYMENT**

    A.    Practice hereby employs Physician and Physician hereby accepts such employment as an employee of the Practice, to provide services as hereinafter described on behalf of Practice and its affiliates, as directed by Practice, on the terms, covenants and conditions set forth in this Agreement.

    B.    In the performance of Physician's duties under this Agreement, Physician shall comply with all applicable local, state and federal laws, statutes, rules and regulations.

    C.    The parties do not intend to establish an independent contractor relationship, joint venture or partnership, either expressly or by implication, between Practice and Physician. Accordingly, by virtue of Physician's status as an employee of Practice, Physician shall have no financial interest in the Practice's accounts receivable, furniture, equipment, leasehold improvements, patient charts and records, and similar property. Further, Physician shall not, without the prior written consent of Practice:

    i.    use any money belonging to Practice or pledge Practice's credit;

duties, responsibilities and obligations under this Agreement, and Physician is free to enter into this Agreement and perform the terms and provisions hereof.

C.   Physician has advised Practice that Physician is bound by a restrictive covenant in favor of Summit Health until August 10, 2023, which would prevent him from practicing at the Practice's Morristown office but would not restrict him from practicing at the Practice's Wayne office, to the Wayne Surgery Center, or St. Joseph's Medical Center (collectively, the **"Wayne Area Locations"**). The Practice agrees that the Physician will not be required to provide services at any locations other than the Wayne Area Locations prior to August 10, 2023.

D.   Physician is not aware of any personal health problem, physical disability or mental disability which now or in the future would materially impair Physician's ability to practice medicine and/or Physician's ability to carry out the duties, responsibilities or obligations to be rendered by Physician under this Agreement.

E.   Prior to the Commencement Date, Physician shall have provided evidence to Practice of adequate occurrence-based and/or claims-based liability insurance to insure against malpractice claims arising out of any and all occurrences Physician may have had prior to the Commencement Date. In the event Physician has obtained claims-based liability insurance, Physician shall have provided evidence to Practice of adequate "tail/prior acts" liability insurance acceptable to Practice.

F.   Except as previously disclosed to the President of the Practice, Physician has never been removed for cause (or resigned prior to removal for cause) from any provider panel of any managed care organization, indemnity insurer or other third-party payor, independent practice association, physician organization, physician-hospital organization or other provider network.

G.   Physician is not a party to any pending malpractice or other patient-related litigation, nor has any such litigation been threatened, nor are any proceedings threatened or pending against Physician before any professional licensing board.

H.   Physician is not a party to any pending investigations or proceedings, nor have any such investigations or proceedings been threatened, the basis of which (i) implicates Physician's professional competence or (ii) could lead to a suspension, revocation, restriction, limitation or termination of medical staff privileges at any hospital at which Physician was ever a member of the medical staff, nor have Physician's medical staff privileges at any hospital been suspended, restricted or terminated at any hospital, nor has physician voluntarily surrendered any such medical staff privileges while any such proceedings were pending or threatened.

I.    Physician has never been convicted of (i) any offense related to the delivery of an item or service under the Medicare or Medicaid programs; (ii) a criminal offense relating to the delivery of a health care item or service; (iii) fraud, theft, embezzlement or other financial misconduct in connection with the delivery of a health care item or service; (iv) obstructing an investigation of any crime referred

3

to in this Section 3(H); or (v) the unlawful manufacture, distribution, prescription or dispensing of a controlled substance.

J.    Physician has never been required to pay any civil monetary penalty under federal law regarding false, fraudulent or otherwise impermissible billing practices.

K.    Physician is not currently, and has never been, excluded from participation in any "federal health care program" as defined in 42 U.S.C. § 1320a-7b(f) (including the Medicare, Medicaid, TRICARE and similar or successor programs with or for the benefit of any government authority) or debarred from contracting with any government authority and has not engaged in any acts that would render the Physician excludable from any such program.

L.    Physician has never been subject to any investigation or proceeding that could lead to any of the events set forth in Section (E),(F),(G),(H),(I) and (J).

M.    Physician is Board Certified in Orthopaedic Surgery.

N.    Physician shall repay, in accordance with all applicable federal requirements, any federal assistance Physician received to pay his or her medical education. Physician agrees and understands that in the event that Physician does not fulfill Physician's obligations to repay federal assistance and the federal government obtains repayment through deductions from the Medicare payments due to Practice from Physician's services, the Practice may immediately offset such deductions against any compensation owed to Physician.

4.    **PHYSICIAN'S COVENANTS**

A.    Physician has disclosed to the Practice that Physician is currently under a temporary restriction that prevents him from performing surgery; Physician shall take all necessary steps to enable him to resume surgery as soon as practicable, and shall thereafter obtain and maintain unrestricted licenses to practice medicine in each state in which the Physician provides medical services under this Agreement;  Physician currently has a valid Controlled Substance Registration Certificate from the United States Drug Enforcement Administration and the New Jersey Division of Consumer Affairs;  In addition, Physician shall, throughout the Term:

B.    remain board certified in orthopedic surgery;

C.    maintain and fulfill all continuing medical education requirements necessary for the maintenance of the Physician's professional licensure;

D.    remain a provider in good standing with each "federal health care program" as defined in 42 U.S.C. § 1320a-7b(f) (including the Medicare, Medicaid, TRICARE and similar or successor programs with or for the benefit of any government authority) in which the Physician participates in conjunction with the performance of services under this Agreement;

4

E.    use his best efforts to become a member in good standing of the medical staff, with appropriate privileges, at St. Joseph's University Medical Center, and St. Joseph's Wayne Medical Center by August 10, 2023, or as otherwise mutually agreed;

F.    not use the premises, equipment, supplies, personnel, or other items provided by or on behalf of the Practice for any purpose other than in connection with the performance of the Physician's services under this Agreement; and

G.    deliver written notice to the Practice, in reasonable detail and together with copies of related documents, within ten (10) calendar days after the Physician becomes aware of:

   i.    the Physician's membership with and/or privileges from any hospital, medical staff, peer review organization, professional society or group, or other health care entity as of the date hereof or subsequently obtained by the Physician, being denied, terminated, suspended, restricted, or revoked, or the Physician's resignation or non-renewal of any such membership and/or privileges;

   ii.    any hospital, medical staff, peer review organization, professional society or group, or other health care entity or any regulatory agency or other government authority threatening or initiating any investigation or disciplinary/corrective action related to the Physician's performance of services under this Agreement or otherwise related to the Physician's professional conduct or competence;

   iii.    the Physician ceasing to be a provider in good standing with any "federal health care program" as defined in 42 U.S.C. § 1320a-7b(f) (including the Medicare, Medicaid, TRICARE and similar or successor programs with or for the benefit of any government authority) in which the Physician participates in conjunction with the performance of services under this Agreement; or

   iv.    any person or entity threatening in writing or initiating any malpractice claim against the Physician.

5.    **DUTIES**

A.    Physician shall devote to Practice all of the time, attention and energy necessary for Physician to perform any and all duties assigned or delegated to Physician by Practice for the purpose of rendering full-time orthopedic surgical services to Practice's patients and for engaging in the practice of surgery in a manner consistent with accepted standards of care and competence.

B.    Physician's duties shall include, but not be limited to:

5

    i.     full-time practice of orthopedic surgery at such specific locations as reasonably directed by Practice based upon the service needs and coverage requirements of Practice;

    ii.    upon attaining medical staff privileges as set forth in Section 4.E., regular attendance and participation in education sessions for the residency program at St. Joseph's Regional Medical Center in Paterson, New Jersey, and Seton Hall University in South Orange, New Jersey;

    iii.   covering office hours;

    iv.   covering on-call requirements; on-call assignments will be determined by the Practice based on the needs of the practice and the availability of physicians, provided that Practice will use its reasonable best efforts to share on-call duties equitably among the physicians of the Practice.

    v.    participating in Practice's cross-coverage arrangements with other groups;

    vi.   meeting reasonable administrative responsibilities;

    vii.  keeping and maintaining (or causing to be maintained) appropriate clinical records relating to all professional services rendered by Physician; and

    viii.  preparing and attending to all reports, claims and correspondence necessary to bill and collect for services provided.

    C.    It is acknowledged and agreed that Physician's employment hereunder will be on a "full-time" basis and that Physician shall devote all of Physician's professional time and efforts exclusively to and for the benefit of Practice. During the Term of this Agreement, Physician shall not, directly or indirectly, render professional, medical, surgical, managerial or directive services to any person or entity, whether or not for compensation, except as an employee of Practice unless and until Physician obtains the prior written consent of Practice.

    D.    Physician's schedule in the office(s), performing surgery, participation in educational and training programs will be dependent upon the reasonable needs of Practice and its patients.

    E.    Physician shall abide by all rules and regulations established by Practice, including, but not limited to, Practice's corporate compliance plan, and the Practice's Employee Handbook, provided that in the event of a conflict between the Employee Handbook and an express provision of this Agreement, the terms of this Agreement shall control.

6.    **COMPENSATION**

    In consideration of the duties to be performed by Physician pursuant to the terms of this Agreement and in addition to the other benefits provided for herein, Practice shall pay Physician compensation as follows:

4863-2646-9656, v. 6

A.  <u>Base Salary</u>.

    i.  During the first two months of the Term, Physician shall be paid a base salary at a rate of Three Hundred Thousand Dollars ($300,000.00) per year.

    ii.  During the Term, commencing February 1, 2023, Physician shall be paid a base salary at a rate of Four Hundred Thousand Dollars ($400,000.00) per year, subject to Section 6(A)(iv).

    iii.  The base salary shall be paid to Physician, in arrears, in equal bi-weekly or bi-monthly installments in accordance with Practice's standard payroll practice and subject to all applicable withholding requirements.

    iv.  In the event that Physician has not become cleared to perform surgery and attain medical staff privileges at Saint Joseph's University Medical Center and an ambulatory surgery center at which the Practice practices (**"Surgical Reinstatement"**) by April 1, 2023, and unless otherwise agreed between the parties, Physician's base salary shall be reduced to Three Hundred Thousand Dollars ($300,000.00) per year until he achieves Surgical Reinstatement.

B.  <u>Productivity Bonus</u>.

    i.  Commencing on the Commencement Date, the Physician shall also be eligible for incentive compensation (the **"Productivity Bonus"**) based upon a percentage of Physician Net Revenue (as hereinafter defined) from the Physician's professional services rendered in excess of a specified threshold amount of Physician Net Revenue in accordance with Section 6(b)(ii). For the purposes of this Section 6(B), **"Physician Net Revenue"** shall mean the actual revenue collected by the Practice during the applicable period for professional medical services personally rendered by the Physician, including consultations and procedures, reduced by the Practice's costs of pharmaceuticals or drug agents administered by Physician or under his direction in performing professional medical services (as applicable), and further reduced by adjustments for all disallowances, such as, but not limited to, debits or withholds as a result of overpayments, modifications to fee schedules, adjustments to coding, corrections and/or audits by Medicare, Medicaid or other payers. If any hospital or health care facility pays the Practice for the Physician's call coverage, any such coverage payments will be included as Physician Net Revenue.

    ii.  For the first twelve (12) months following the Commencement Date, and for each full year of the Term thereafter (each such year being referred to herein as a **"Bonus Period"**), Physician will be entitled to a Productivity Bonus equal to (x) forty percent (40%) of Physician Net Revenue collected during the applicable Bonus Period in excess of Eight Hundred Thousand Dollars ($800,000.00) (the **"Tier 1 Threshold"**), but less than or equal to One Million Dollars ($1,000,000.00), plus (y) fifty percent (50%) of Physician Net Revenue in excess of One Million Dollars ($1,000,000.00) (the **"Tier 2 Threshold"**). A Productivity Bonus for each

7

Bonus Period shall be payable, subject to withholding for taxes, within ninety (90) days following the end of the applicable Bonus Period.

       iii.    The Productivity Bonus specified herein shall be (A) calculated in accordance with the Practice's normal and reasonable accounting methodologies; (B) determined no later than ninety (90) days after the end of the applicable Bonus Period; (C) paid in accordance with clause 6(C)(ii); and (D) paid regardless of whether Physician is employed by Practice at the time said calculations are made or at the time the Productivity Bonus is to be paid. In the event that this Agreement is terminated after the Initial Term but prior to the end of the then current Bonus Period, the Tier 1 Threshold and Tier 2 Threshold for such final partial Bonus Period shall each be reduced by a fraction the numerator of which is the number of days in such Bonus Period up to the effective date of termination, divided by 365. If this Agreement is terminated for any reason prior to the end of the Initial Term, then the Tier 1 and Tier 2 Thresholds shall not be pro rated for any partial Bonus Period.

## 7.    BUY-IN

    After the first anniversary of the Commencement Date, Practice and Physician shall enter into discussions regarding a potential purchase by the Physician of an equity interest in the Practice upon terms mutually agreeable to Practice and Physician. Nothing in this Section 6 shall modify Practice's right to terminate this Agreement pursuant to any other provision of this Agreement, nor shall this paragraph require Practice to offer Physician the opportunity to purchase an equity interest in Practice, and it is acknowledged and agreed that the Practice shall have no liability to Physician pursuant to this Section 7 or otherwise in the event the parties are not able to reach an agreement on the terms of a buy-in regardless of the reason therefor.

## 8.    VACATION: SICK LEAVE; CME

    A.    In addition to any lawful entitlements to leave mandated by Federal and State Law, to the extent applicable to Practice, pursuant to the Family Medical Leave Act ("FMLA") or the New Jersey Family Leave Act ("NJFLA"), during the Term of this Agreement, Physician shall be entitled to the following:

       i.    Four (4) weeks paid vacation per year during the Term of this Agreement, which may be taken subject to approval of the president of the Practice, the approval of which shall not be unreasonably withheld provided that such leave is not inconsistent with performance of the Physician's responsibilities hereunder;

       ii.    Five (5) sick days per year during the Term of this Agreement. Practice reserves the right to require a physician's note for any medical absence; and

       iii.    Leave to attend continuing medical education events, not to exceed one (1) week per year of this Agreement.

    B.    Physician acknowledges that unused vacation days shall not be carried over to subsequent years nor shall there be any compensation in lieu of unused vacation days. Physician

8

also acknowledges that the number of paid vacation and sick days per year will be prorated for partial years of employment under this Agreement. Physician shall be entitled to the same paid holidays as are provided to other non-member employees of Practice in accordance with Practice policy.

9.    **DISABILITY**

A.    The term "**Disability**" as used in this Agreement shall mean the inability of Physician, by reason of physical or mental injury, illness or condition, to substantially perform Physician's duties as an employee of Practice, which inability and the continuance thereof, has been reasonably determined by Practice in its sole and non-reviewable discretion.

B.    In the event of a Disability, then the following wage continuation plan shall become effective:

   i.    during the first ten (10) days of such Disability, Physician shall continue to receive an amount equal to Physician's base salary; and

   ii.    during the Disability, Physician shall be permitted to utilize any accrued vacation or sick days before the ten (10) day time period, discussed above, begins.

   iii.    after ten (10) days of Disability, Physician shall receive no further compensation from Practice.

C.    If Physician returns to Physician's professional duties as an employee of Practice on a full-time basis but thereafter, within one (1) year of such return, becomes disabled, then such new Disability (but not such interim period of full-time work) shall be deemed a continuation of the prior Disability and no additional wage continuation benefit as set forth herein shall be available to Physician.

10.    **EMPLOYEE BENEFITS**

A.    Practice shall purchase and maintain for Physician professional liability insurance in such amounts and with such a company as shall be determined by Practice, but in no event shall such coverage be less than one million dollars ($1,000,000.00) per occurrence and three million dollars ($3,000,000.00) in the aggregate. The insurance shall only afford protection to Physician for acts committed while working within the scope of Physician's assigned duties for Practice. On the last day of Physician's employment hereunder, Physician shall either immediately reimburse Practice for any prepaid malpractice insurance premiums paid by Practice on Physician's behalf for any period following the last day of Physician's employment hereunder or (ii) terminate such prepaid malpractice insurance policy and cause any refunds provided as a result of such termination to be remitted to Practice. Upon termination of this Agreement, in the event that the Practice's professional liability insurance then in effect is on a claims made basis, Practice shall, at Practice's sole expense, secure and maintain such insurance policies or riders so as to ensure coverage for Physician's acts and omissions occurring during the Term of this Agreement, including, for example, purchasing a "tail" with the original insurer or by purchasing a "prior acts" rider with a new company, which company shall be subject to

9

Practice's reasonable consent and approval. Without limiting the generality of the foregoing, the Practice hereby acknowledges that the professional liability insurance currently maintained by the Practice is on a "modified claims made" basis, which includes tail coverage. In the event that Practice obtains different professional liability insurance that does not provide tail coverage or prior acts coverage, then Practice shall notify Physician at least ninety (90) days before making such change.

B.    Physician shall be entitled to an allowance, not to exceed Ten Thousand Dollars ($10,000.00) per year (or pro-rated for any partial calendar year of employment) to cover Physician's actual costs of business use of his personal automobile and cell phone, all license fees including Physician's New Jersey medical license, CDS and DEA registrations, hospital and society dues and continuing medical education expenses. All such reimbursement shall be contingent upon Physician's presentation of satisfactory evidence of payment.

C.    Practice shall purchase and maintain medical and dental insurance for Physician, in such amounts and with such company or companies as provided to the other employees of Practice, so long as Physician qualifies to participate in the health insurance plan selected by Practice. The medical and dental insurance currently maintained by the Practice for its physicians includes family coverage. Physician shall also be entitled to participate in Practice's retirement savings plan, subject to satisfaction of applicable eligibility requirements and waiting periods.

D.    The parties acknowledge and agree that all benefits and expense reimbursement provisions set forth in this Section 9 are subject to change in the event that the Practice's benefits and expense reimbursement policies change for all physicians employed by the Practice.

E.    It is intended by Practice and Physician that all such expenses be ordinary and necessary expenses incurred in connection with the business activities of Practice and Physician, and it is agreed that, in the event any reimbursed expenses are disallowed by the Internal Revenue Service ("**IRS**") as deductions to Practice, Physician shall reimburse Practice for such disallowed expenses for which Physician was paid, within sixty (60) days after final determination of said disallowance. Physician shall pay any penalties and resulting interest charges imposed by the IRS for disallowed expenses.

11.    **BILLING AND COLLECTION; CONTRACTS**

A.    Physician hereby assigns to Practice any right or claim to any and all fees, compensation and other income attributable to the provision of professional services by Physician during the Term of this Agreement, all of which shall be the property of, and promptly remitted to, Practice.

B.    Physician shall participate in any third-party reimbursement or managed care program requested by Practice and shall maintain all qualifications and credentialing criteria and carry out all responsibilities in connection therewith.

C.    Physician understands and agrees that during the Term of this Agreement all contracts or arrangements entered into by Physician (or by Practice involving the services of Physician) with any HMO, PPO, POS, managed care program, insurance company or similar program or entity shall belong to and be for the exclusive benefit of Practice. Physician hereby

10

assigns to Practice all of his interest in all such contracts and arrangements and hereby grants Practice an irrevocable power of attorney to enter into or terminate such contracts on Physician's behalf and grants to Practice the right to bill for and in Physician's name under such contracts, as permitted by applicable law. No negotiations with respect to any such contracts or arrangements shall be conducted by Physician except as Practice shall otherwise permit in writing.

D.      The parties hereto agree to comply with the provisions of the Social Security Act relating to Medicare and the regulations promulgated pursuant thereto, as well as those provisions of federal and state law relating to Medicaid.

E.      Except as directed by Practice, Physician shall not bill any carrier, Medicare intermediary, any insurer, or any patient or beneficiary for any services performed by Physician during the Term of this Agreement.

F.      Should any governmental or third-party payor audit result in a loss of revenue and/or penalties to Practice due to fraudulent submissions or documentation made by or at the direction of Physician, Physician shall assume all financial responsibility of reimbursement to Practice and shall indemnify and hold the Practice harmless from and against any liability cost or expense incurred in connection therewith. This provision shall survive the termination, for any reason, of this Agreement.

12.    **TERMINATION**

A.      This Agreement may be terminated upon the occurrence of the following

i.      The mutual agreement of Practice and Physician to terminate this Agreement;

ii.     At any time upon sixty (60) days written notice of either party to the other;

iii.    By the Practice upon the death of Physician;

iv.     By the Practice upon the occurrence of any event which constitutes "just cause" for termination pursuant to Section 11(B) of this Agreement, in which case the Practice may terminate this Agreement immediately; or

v.      By the Physician upon the occurrence of any event which constitutes "Good Reason" pursuant to Section 12(C) of this Agreement.

B.      For purposes of this Agreement, the term "just cause" shall include the following events or occurrences:

i.      the revocation, suspension, restriction or limitation of Physician's license to practice medicine in the State of New Jersey where such revocation, suspension, restriction or limitation is due to Physician's conduct, impairment or incompetency;

11

ii.  the revocation, suspension, restriction or limitation of Physician's staff privileges at any hospital at which Physician holds staff privileges;

iii.  Physician's failure to materially abide by written rules and regulations of Practice, including, but not limited to, Practice's corporate compliance plan;

iv.  Physician's loss of eligibility to participate in any third party health plan with which Practice does business;

v.  Physician's (a) conviction of a felony or a crime of moral turpitude (it being understood by the parties that for the purposes of this subsection a plea of guilty, non volt, nob contendere or any other such disposition of an alleged crime of moral turpitude shall be deemed a conviction); (b) participation in any dishonest conduct vis a vis the assets or income of Practice, whether or not of a criminal nature; or (c) participation in conduct having a reasonable prospect of materially damaging the reputation or integrity of Practice, provided that Physician fails to cure the same in a manner acceptable to the Practice within thirty (30) days of receiving written notice;

vi.  Physician's failure to perform Physician's duties in a competent and professional manner consistent with the professional and ethical standards of the medical profession;

vii.  the revocation, suspension, restriction or limitation of Physician's narcotics numbers issued by the State of New Jersey or the United States Drug Enforcement Administration;

viii.  Physician's failure to maintain his Board Certification in Orthopaedic Surgery;

ix.  any determination by any governmental agency, either civilly or criminally, that Physician has violated any rule or regulation pertaining to the Medicare or Medicaid programs;

x.  the involuntary or voluntary liquidation of Practice, the appointment of a receiver for Practice, or the assignment of this Agreement for the benefit of creditors;

xi.  a disability that impairs the Physician's ability to practice medicine for a period of one hundred (100) days, not necessarily consecutive, during any one (1) year period of this Agreement;

xii.  Physician's breach of any material term, representation, warranty (including without limitation, the representation and warranties set forth in Section 3) covenant or condition of this Agreement or any directive of Practice provided that the Practice gives the Physician written notice of

12

4863-2646-9656, v. 6

such breach and Physician party fails to cure the same in a manner acceptable to the Practice within thirty (30) days of receiving notice, except that any breach likely to cause harm to any patient shall only be subject to a ten (10) day cure period.

xiii. Physician's second (2nd) breach of any material term, representation, warranty (including without limitation, the representation and warranties set forth in Section 3) covenant or condition of this Agreement or any directive of Practice within any two (2) year period, for which second (2nd) breach the Physician shall not have a cure right and upon which second (2nd) breach the Practice may terminate this Agreement immediately upon notice;

xiv. The failure of the Surgical Reinstatement Date to occur on or before August 10, 2023, or such later date as the Practice may agree; and

xv. any other event customarily considered "just cause" grounds for the termination of employment.

C. For purposes of this Agreement, **"Good Reason"** shall mean any of the following events or occurrences:

i. A reduction in the Physician's base salary as provided in Section 6(A);

ii. An adverse change in the formula for calculating the Physician's Productivity Bonus as provided in Section 6(B);

iii. The cessation of the practice of medicine by the Practice (other than as the result of a reorganization or merger in which the successor or surviving entity assumes the obligations of the Practice under this Agreement); or

iv. Practice fails to pay any base salary or Productivity Bonus under this Agreement when due, provided that there is no bona fide dispute as to whether such compensation is due and owing, and fails to cure such non-payment within thirty (30) days after written notice to Practice by Physician.

D. In the event Practice exercises its right to terminate Physician pursuant to Section 12(A)(ii), then Practice may, in its sole discretion, require Physician to permanently vacate each of Practice's offices and cease providing services on behalf of Practice at any time prior to the expiration of the sixty (60) day period following notice of termination, in which case Practice will make payments to Physician in an amount equal to what Physician's base salary would have been had Physician continued to provide services hereunder throughout such sixty (60) day period. Such payments shall fully satisfy Practice's obligations to Physician with respect to the base salary owed to the Physician during such sixty (60) day period. Should the Practice require Physician to vacate its offices and cease providing services in accordance with the provisions of this Section 11(C), the termination date of Physician's employment hereunder shall be deemed to be the last day on which Physician provided services on Practice's behalf.

13

13. **MEDICAL RECORDS, RESTRICTIVE COVENANTS AND CONFIDENTIALITY**

A.  Physician acknowledges that Physician's relationship with Practice will be one of trust and confidence and that there will be available to Physician patient records and business sources of Practice.

B.  In consideration of the compensation, training and experience Physician will gain as an employee of Practice and in light of Physician's familiarity with the patients of Practice and the physicians and other referral sources within the community, Physician expressly agrees to each of the following:

    i.    All business records and patient records of Practice, whether produced by Physician during the course of Physician's employment or otherwise acquired by Practice, are the sole property of Practice.

    ii.    All monies collected for services rendered by Physician, whether payment is made directly or indirectly, are the sole property of Practice.

    iii.    During the Term of this Agreement and for a period of two (2) years following the termination, non-renewal or expiration of this Agreement for any reason (the **"Restricted Period"**), the following restrictions shall apply:

        (a)    Physician shall not engage in, supervise, organize, invest in, nor carry on directly or indirectly with or without compensation or otherwise participate in any manner in the practice of orthopedic medicine and/or surgery or any other business being conducted by Practice either on Physician's own behalf or on behalf of any person, company, firm, corporation or any other entity at any other entity anywhere within a five (5) mile radius of 504 Valley Road, Suite 200, Wayne, New Jersey 07470, and any other location at which the Physician has provided more than 10% of his services on behalf of the Practice during any period of twelve (12) consecutive months during the Term (the **"Restricted Area"**).

        (b)    Physician shall not hire or solicit any employee of Practice to leave their employ and work for anyone in competition with Practice or for any other person or entity with which Physician is associated as an owner, employee, consultant or otherwise.

        (c)    Physician shall not (1) directly or indirectly disclose to any other person, firm, Practice or other entity the names and addresses of any of the patients of Practice; (ii) directly or indirectly solicit any patient of Practice; or (iii) induce or attempt to influence any patient, insurance company, managed care company, hospital, physician, health care provider, health care facility or any other

14

entity, firm or person with a referring relationship with Practice, to alter that referring relationship in any way.

    iv.    Upon termination of this Agreement, Physician shall resign his privileges at St. Joseph's University Medical Center, and St. Joseph's Wayne Hospital, and shall not reapply for such privileges until after the expiration of the Restricted Period.

    v.    In the event that the Practice terminates this Agreement without cause pursuant to Section 12(A)(ii), or in the event that the Physician terminates this Agreement for Good Reason pursuant to Section 12(A)(v), the Restricted Period shall be reduced to six (6) months after the effective date of termination.

C.    At any time after termination of this Agreement, Physician shall not remove or make copies of business records, patient records, patient lists or any records or other property of Practice without the prior written consent of Practice.

D.    Practice and Physician recognize that the restrictive covenants set forth in this Section 13 are reasonable and properly required for the adequate protection of the business of Practice and it is the desire and intent of Practice and Physician that the provisions of this Section 13 be enforced by any court with jurisdiction to their fullest extent. In the event that any such restrictive covenant is deemed to be unreasonable by a court of competent jurisdiction, Physician agrees and submits to the reduction of such restrictive covenant to such an area or period as the said court shall deem reasonable.

E.    In the event Physician is in violation of the restrictive covenants set forth in this Section 13, Physician agrees that the time limitation thereof shall be extended for a period of time equal to the period of time during which such breach or breaches occur; and in the event it is necessary to seek relief against such breach or breaches in any court, these restrictive covenants shall be extended for a period of time equal to the pendency of the proceedings before such court, including all appeals.

F.    Physician acknowledges and agrees that any violation of the restrictive covenants of this Section 13 would cause substantial, irreparable damage to Practice and that it is impossible to measure in money the damages that would be caused to Practice by such violation. Accordingly, Physician acknowledges and agrees that in the event that Physician violates any of these covenants, Practice shall be entitled to obtain injunctive relief to prohibit Physician from such action and Physician hereby consents to the entering of a court order compelling such relief. Nothing herein shall be construed as prohibiting Practice from pursuing any other remedy or remedies available for a breach or threatened breach, including recovery of damages from Physician. Physician agrees to indemnify, defend, and hold the Practice and any of its directors, officers, employees, independent contractors, and other agents free and harmless from any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies, including interest, penalties, attorney's fees, and/or legal costs, fees and expenses arising from or related to any breach by the Physician of any representation, warranty, covenant, obligation or agreement contained in this Section 13.  Notwithstanding the foregoing, in the

15

event that the Practice commences a legal proceeding to enforce the terms of this Section 13, and there is a final non-appealable decision rendered in such proceeding in favor of Physician that the Physician did not commit the breach(es) of this Section 13 alleged in such proceeding, then the Physician shall be entitled to recover from the Practice, the costs of such proceeding, including reasonable attorneys' fees.

G.    The existence of any claim or cause of action by Physician against Practice, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Practice of the restrictive covenants set forth in this Section 13.

14.    **NOTICES**

Notices required or permitted to be given under this Agreement shall be in writing and shall be sent by certified mail, return receipt requested, by hand delivery or by a nationally recognized overnight delivery service. All notices shall be sent to the addresses of the parties first above written, or to such other address as the parties may from time to time designate in writing, and shall be deemed given when sent, and shall be effective upon receipt or three days of mailing, whichever occurs fast. A copy of any notice to Practice shall be sent to Charles H. Newman, Esq., Frier & Levitt LLC, 84 Bloomfield Avenue, Pine Brook, New Jersey 07058.

15.    **AMBIGUITIES**

The parties agree and acknowledge that this is a negotiated agreement and that the rule of construction that any ambiguities are to be construed against the drafting party shall not apply.

16.    **ENTIRE AGREEMENT**

This Agreement sets forth the entire agreement and understanding of the parties and voids any currently existing agreements of the parties, both verbal and written. This Agreement may not be modified in any manner except by an instrument in writing executed by the parties.

17.    **WAIVER**

The failure of either party to insist upon strict adherence to any term, covenant or condition of this Agreement on any occasion shall not be considered a waiver or relinquishment of any right of such party or parties to insist upon strict performance of that term, covenant, or condition, or any other term, covenant or condition, of this Agreement at any time thereafter.

18.    **INDEMNITY**

Physician agrees to indemnify, defend and hold harmless Practice from and against any actions on the part of Physician in entering into this Agreement which may be a breach of any other agreement to which Physician is or was a party. Practice agrees to indemnify, defend and hold harmless Physician from and against any actions on the part of Practice in entering into this Agreement which may be a breach of any other agreement to which Practice is or was a party.

19.    **HEADINGS**

16

4863-2646-9656, v. 6

The caption headings in this Agreement are solely for convenience or reference and shall not affect its interpretation.

20.    **SEVERABILITY**

If any provision of this Agreement shall be declared invalid or illegal for any reason whatsoever, then notwithstanding such invalidity or illegality, the remaining terms and provisions of this Agreement shall remain in full force and effect in the same manner as if the invalid or illegal provisions had not been contained herein.

21.    **BIND AND INURE; ASSIGNMENT**

Physician shall not have the right to assign this Agreement or to delegate Physician's duties hereunder. Practice shall have the right to assign this Agreement to an affiliated organization, a successor organization, or in the event Company merges with another entity.

22.    **CHOICE OF LAW; JURISDICTION AND VENUE**

This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey. Physician and Practice consent to the filing of an action in, and hereby personally submit to the jurisdiction of, the state or federal courts located in Bergen County, New Jersey and further agree that such courts shall be exclusive courts of jurisdiction and venue for any litigation which Physician may file. Physician and Practice hereby consent to service of process in any such action by notice given in accordance with the terms of this Agreement.

23.    **NO OFFER, OPTION OR RESERVATION**

The submission of this Agreement for examination does not constitute an offer or reservation of any rights for the benefit of any party, and this Agreement shall become effective, and the parties shall become legally bound, only if, as and when the parties, mutually agreeing to be bound by the terms hereof, execute and deliver this Agreement.

24.    **INDEPENDENT COUNSEL**

The Physician agrees and acknowledges that Charles H. Newman, Esq., and the law firm of Frier & Levitt, LLC, (collectively the "**Law Firm**") has represented the Practice with respect to the preparation and execution of this Agreement and that Physician has been advised to retain independent counsel for advice regarding Physician's rights and obligations under this Agreement. Physician represents that Physician has obtained the advice of independent legal counsel in connection with the employment contemplated hereby and that Physician has reviewed this Agreement with such independent counsel or has waived its right to do so.

25.    **ARBITRATION**

A.    Any controversy, claim or dispute arising out of, or in any way relating to Physician's employment with Practice or the termination thereof, including but not limited to (i) any and all claims based upon any law, statute, constitution or executive order or based in contract, tort or common law; and (ii) any and all claims arising under any civil rights law,

17

4863-2646-9656, v. 6

including, but not limited to Title VII of the Civil Rights Act of 1964, as amended, the New Jersey Law Against Discrimination, the New Jersey Conscientious Physician Protection Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, the Age Discrimination in Employment Act of 1967, as amended, the Americans with Disabilities Act, Sections 503 and 504 of the Rehabilitation Act, the New Jersey Family Leave Act, the Family and Medical Leave Act, the Employment Retirement Income Security Act, as amended, the Civil Rights Act of 1991, the Fair Labor Standards Act, as amended, 42 U.S.C. §1981 and any local, state or federal law, whether statutorily codified or not, and whether arising in contract or in tort, governing discrimination in employment, the payment of wages and benefits, breach of express or implied contact, wrongful discharge, negligent or intentional infliction of emotional distress or any claim for personal injury or tort, even if those claims would otherwise include a right to trial by jury, shall be resolved by binding arbitration in accordance with the Rules of Procedure for Arbitration of the American Health Lawyers Association Alternative Dispute Resolution Service then pertaining. Arbitration proceedings shall be held in Passaic County, New Jersey.

26.    **ASSIGNMENT**

This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, executors, administrators, successors and assigns. Notwithstanding the foregoing, this Agreement may not be assigned by Physician or Practice except that Practice shall have the right to assign this Agreement to the purchaser of all or substantially all of the Practice's business, to the surviving entity of any merger between the Practice and any other entity, to an affiliate or subsidiary of the Practice, or to any successor in interest following a reorganization of Practice.

*[Signature page follows.]*

18

4863-2646-9656, v. 6

**IN WITNESS WHEREOF,** the parties hereby agree to the terms, covenants and conditions of this Agreement as of the date first above written.

**WITNESS/ATTEST:**

Name: JINGA SKALSKA-DYBAS

**WITNESS/ATTEST:**

Name: JINGA SKALSKA-DYBAS

**PHYSICIAN:**

Michael Kenneth Shindle, M.D.

**PRACTICE:**
**New Jersey Orthopedic Institute, LLC**

By: _____

Vincent K. McInerney, M.D., President

19

4863-2646-9656, v. 6

# EXHIBIT C

---------- Forwarded message ---------
From: **Kinga Skalska-Dybas** <kinga@njorthoinstitute.com>
Date: Wed, Jan 15, 2025 at 5:52 PM
Subject: RE: Shindle Elite Cases
To: Michael Shindle <mikeshindle@gmail.com>

Mike,

1. I just wanted to let you know that the Elite billing company did not bill several cases for your assistance. I will ask Jissel to work on it. I will also speak with Dr. McInerney tomorrow regarding your question.
2. **Bonus: $208,562.68**
3. Unfortunately, I can't determine what was billed for PRP, as we are billing only for the administration component, usually 20610 or 20611. We billed CPT 20611 – 462 times with a total reimbursement of $118,118.62

Sorry for not getting back to you sooner, but I wanted to have the correct numbers. Let me know if you have any questions.

# EXHIBIT D



**This endorsement changes your policy. Please read it carefully.**

**Policy issued to:** Michael Shindle, MD

**Policy number**: ‌‌‌2809                    **Endorsement issue date:** 06/09/2025
**Endorsement effective date:** 03/01/2025

---

### OPTIONAL REPORTING ENDORSEMENT

#### What this endorsement does

In consideration of payment of the premium shown below, this endorsement extends the time for reporting *claims* under *your* terminated Medical Professional Liability Policy. This endorsement will remain in effect indefinitely unless the *Aggregate Limit* is exhausted paying *claims*.

| Protected person or organization | Premium |
|---|---|
| Michael K. Shindle, MD | $53,034 |

When an organization is named in this endorsement, it is covered only for its vicarious liability resulting from the *professional activities* by:

#### *Your Limits* of *Liability* under this endorsement

Two limits apply to the amount *we* will pay for medical professional liability *claims* covered under this endorsement.

The *Each Loss Limit* is $1,000,000.

The *Each Loss Limit* may vary if *you* have purchased higher limits from time to time.  *Your professional activities* are covered only for the *Each Loss Limit* displayed next to the *protected period*.  The *Each Loss Limit* displayed below includes any higher *Each Loss Limit* applicable to that *protected period*.

*Protected periods* begin and end at 12:01 a.m. on the dates shown below:

| Retroactive Date | Ending Date | Limits *Each Loss Limit/Aggregate Limit* |
|---|---|---|
| January 16, 2023 | March 01, 2025 | $1,000,000/$3,000,000 |

The *Aggregate Limit* is $3,000,000